IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 06-377 |
| CHARLES WHITE, et al. | : | |

SURRICK, J.                                                    SEPTEMBER  8, 2008

<u>MEMORANDUM</u>

Presently before the Court are sentencing memorandums regarding the loss amount to be attributed to five defendants convicted of participating in a large-scale bank fraud and identity theft conspiracy.

I.      BACKGROUND

On July 26, 2006, a federal grand jury returned an indictment charging Defendants Charles White, Allen Smith, Michael Merin, Antoine Norman, Akintunde Crawford and five co-defendants with various crimes related to bank fraud and identity theft.

The indictment charged Defendant White with conspiracy in violation of 18 U.S.C. § 371 (Count 1); bank fraud in violation of 18 U.S.C. § 1344 (Counts 2 – 5); and aggravated identity theft in violation of 18 U.S.C. § 1028A (Counts 6 – 14, 16 – 22).[1]  (Doc. No. 1.)

The indictment charged Defendant Smith with conspiracy (Count 1), bank fraud (Counts 2 – 5), and aggravated identity theft (Counts 16 – 22).  (Doc. No. 1.)

_____

[1] Count 15 of the indictment, charging Defendants White and Merin with aggravated identity theft, was dismissed.  (Doc. No. 190.)

The indictment charged Defendant Merin with conspiracy (Count 1), bank fraud (Count 2), and aggravated identity theft (Counts 6 – 12, 14, 17).[2]  (Doc. No. 1.)

The indictment charged Defendant Norman with conspiracy (Count 1); bank fraud (Counts 2 – 5); and aggravated identity theft (Counts 6 – 8, 11, 13, 16 – 22).  (Doc. No. 1.)

The indictment charged Defendant Crawford with conspiracy (Count 1); bank fraud (Counts 3-5); and aggravated identity theft (Counts 13, 16, 18-22).  (Doc. No. 1.)

The trial took place from August 27 – 30 and September 4 – 5, 2007.  On September 7, 2007, the jury returned verdicts of guilty against Defendants White, Merin, Norman, and Crawford on all Counts.  Defendant Smith was found guilty on Counts 1, 2 – 3, 16 – 17 and 20 – 22, and not guilty on Counts 4 – 5 and 18 – 19.

The five co-defendants mentioned above are Kelly Taylor, Lisa Smith, Rachel Lukovsky, Terry Hughes, and Kevin Norris.  These co-defendants were "runners" for the identity theft and bank fraud conspiracy.  The "runners" would receive fraudulent checks from members of the conspiracy and cash the checks at various banks either by walking into the bank or using the drive-in facilities.  The proceeds from the fraudulent check cashing would then be split up among members of the conspiracy.  Taylor, Smith, Lukovsky, Hughes, and Norris all entered into guilty plea agreements with the Government and all testified at trial against White, Norman, Smith, Crawford, and Merrin.[3]

---

[2] Count 19 of the indictment, charging Defendants White, Smith, Merin, Norman, Crawford, and Lisa Smith with aggravated identity theft, was dismissed as to Merin.  (Doc. No. 190.)

[3] During the course of their testimony, the runners identified bank surveillance photographs which were taken of them as they passed fraudulent checks.  They also testified in detail concerning the operations of this bank fraud and identity theft conspiracy, identifying the

Defendants' sentencing hearings were originally scheduled for December 6, 2007.  (Doc. No. 192.)  Upon consideration of joint motions to continue scheduling filed by defense counsel, (*see* Doc. Nos. 236, 269), we have twice continued the scheduled sentencing dates, (*see* Doc. Nos. 237, 271).  On March 4, 2008, defense counsel filed a Joint Defense Motion for a Joint Hearing on the Amount of Loss Attributable to the Defendants.  (Doc. No. 270.)

On June 12, 2008, we held a hearing to determine the amount of loss attributable to Defendants White, Smith, Norman, Merin, and Crawford.  (Doc. Nos. 292, 295.)  United States Postal Inspector Khary Freeland testified for the Government at the hearing.  (*See* Hr'g Tr., June 12, 2008.)  At the conclusion of the hearing, counsel were directed to file memoranda of law addressing the issues raised at the hearing.  (Doc. No. 295.)

## II.   DISCUSSION

### A.   Total Amount of Loss

Section 2B1.1(b)(1)  of the Sentencing Guidelines provides for increases to a defendant's offense level based upon the amount of loss attributable to fraud.  U.S.S.G. § 2B1.1(b)(1) (2007).[4]  A loss of more than $400,000, up to and including $1,000,000, results in an increase of 14 levels.  U.S.S.G. § 2B1.1(b)(1)(H).  A loss of more than $1,000,000, up to and including $2,500,000, results in an increase of 16 levels.  U.S.S.G. § 2B1.1(b)(1)(H).

"Loss amount is a sentencing fact (a specific offense characteristic), so it must be found by a preponderance of the evidence."  *United States v. Ali*, 508 F.3d 136, 145 (3d Cir. 2007). *See also United States v. Pinkerman*, No. 05-4487, 217 Fed. Appx. 118, 119 (3d Cir. Feb. 16,

---

various members of the conspiracy and testifying as to their participation.

[4] We rely upon the 2007 Edition of the Sentencing Guidelines throughout this opinion.

2007) ("Under the advisory Guidelines, the Sixth Amendment is not offended by judicial fact

finding." (citing, *inter alia*, *United States v. Dragon*, 471 F.3d 501, 506-07 (3d Cir. 2006);

*United States v. Gunter*, 462 F.3d 237, 243-44 (3d Cir. 2006))).  "Under the Guidelines, the

Government has the burden of showing the amount of loss resulting from criminal conduct."

*United States v. Tupone*, 442 F.3d 145, 156 (3d Cir. 2006).  "The sentencing court, though it

need not reach a precise figure as to loss, must make a 'reasonable estimate' of loss that must be

based on the 'available information' in the record."  *Id*. (citing U.S.S.G. § 2B1.1 app. note 3(C)).

For sentencing purposes, reliable hearsay is admissible and the Confrontation Clause

does not apply.  *See United States v. Robinson*, 482 F.3d 244, 246 (3d Cir. 2007) ("Both the

Supreme Court and this Court of Appeals have determined that the Confrontation Clause does

not apply in the sentencing context and does not prevent the introduction of hearsay testimony at

a sentencing hearing." (citing *Williams v. Oklahoma*, 358 U.S. 576, 584 (1959), *United States v.*

*Kikumura*, 918 F.2d 1084, 1099-1100 (3d Cir. 1990))); *see also Pinkerman*, 217 Fed. Appx. at

120 ("Sentencing courts could rely on hearsay evidence before *Booker*, and they can rely on such

evidence today." (citing *United States v. Grier*, No. 05-1698, 475 F.3d 556, 2007 U.S. App.

LEXIS 2483, at *35 (3d Cir. Feb. 9, 2007))).  In addition, the Third Circuit has held that the

Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004), "provides no

platform to reverse prior Supreme Court decisions that expressly allow the introduction of

hearsay evidence in the sentencing context."  *Robinson*, 482 F.3d at 246.

In its sentencing memoranda regarding loss, the Government argues that the loss amount

attributable to Defendants should be approximately $2,000,000, with a corresponding offense

level increase of 16.  (Doc. No. 293 at 2; Doc. No. 299 at 1.)  Defendants Charles White, Allen

Smith, and Antoine Norman argue that the loss amount is $417,935.32, with a corresponding

offense level increase of 14.  (Doc. No. 296 at unnumbered 5.)[5]  Defendants Michael Merin and

Akintunde Crawford did not address the issue of the total amount of loss.  Rather, they argue that

lesser amounts of loss should be attributed to them.  (Doc. No. 300 ¶ 3; Doc. No. 302 at

unnumbered 6.)

At the joint hearing on June 12th, the Government offered into evidence a spreadsheet

summarizing the Government's loss calculations, as well as Exhibits which detail the check-

cashing losses attributable to the runners Taylor, Smith, Lukovsky, and Hughes, (Exs. A, B, C,

D); Exhibits which detail losses from runners who did not testify at trial, (Exs. E, F, H); an

Exhibit detailing losses calculated by matching phone calls made to Commerce Bank's

interactive voice response system ("IVR") with phone numbers associated with each Defendant,

(Ex. G); an Exhibit setting forth additional losses associated with makers of checks that had been

fraudulently passed by runners Taylor, Smith, Lukovsky, Hughes, and Goldberg, (Ex. J); and an

Exhibit setting forth additional losses suffered by Wachovia Bank as a result of bank fraud and

identity theft related to this conspiracy, (Ex. K).  Inspector Freeland testified regarding the basis

for the loss calculation on each of the Exhibits.

The Government calculated the losses to the various banks as a result of the conspiracy to

be approximately $1,092,759.  (Hr'g Tr. 6.)  This is the sum of the loss figures set forth in

Exhibits A through K.  The Government argues, however, that the total loss figure was in reality

---

[5] Defendants Smith and Norman have adopted the Argument and Memorandum of Law filed by White.  (*See* Letter from Peter A. Levin, Esq., on behalf of Allen Smith, to the Court (June 19, 2008); Letter from Marc I. Rickles, Esq., on behalf of Antoine Norman, to the Court (June 17, 2008)).

approximately $2,000,000.  (Doc. No. 293 at 4.)  The Government bases this argument upon (1) testimony at trial that Charles White bragged to undercover Postal Inspector Yvette Thomas that he had made $2,000,000 from this scheme, (2) trial testimony from the check runners regarding amounts involved in and frequency of their check-cashing activities, and (3) documentary evidence from the banks.  (*Id.*)

Defendants White, Smith, and Norman argue that the total loss amount was between $400,000 and $1,000,000.  (Doc. No. 296 at 5.)  They accept the loss amounts in Exhibits A through E, which totals $272,598.  (Doc. No. 296 at unnumbered 2.)  They also accept the loss amount of $145,337.32, representing the total of some of the losses set forth in Exhibit K.  (Doc. No. 296 at 5.)  The loss figures from Exhibits A through E and the conceded losses from Exhibit K total $417,935.32.  White, Smith, and Norman dispute, however, the figures listed in Exhibits F through J, as well as a significant portion of the losses set forth in Exhibit K.

We will consider each Exhibit, and the testimony with regard thereto, individually.

1.   *Exhibit A*

The losses associated with Kelly Taylor listed on Exhibit A amount to $98,595.[6]  At trial, Taylor testified that during her career with this identity theft ring she cashed fraudulent checks worth approximately $500,000 to $1,000,000.  (Trial Tr. 8/29/07 at 174.)

---

[6] The main spreadsheet created by Inspector Freeland lists the figure as $99,345 while Exhibit A itself lists the figure $99,445.89.  Adding up the numbers from the "risk" column in Exhibit A results in the amount $99,445.  However, while cross-checking makers and amounts of checks on various Exhibits, we noted that the same fraud appears to be listed on both Exhibit A and Exhibit E.  Kelly Taylor and Celia Goldberg are both, apparently, responsible for passing an El Hachemi Mouaci maker check to payee Lori Arnold on January 26, 2005, at 7:13pm for $850 in Hatboro, Pennsylvania.  This loss should only be counted once.  Therefore, we are deducting $850 from Exhibit A's total of $99,445 to reach the figure $98,595.

6

Inspector Freeland connected some of the fraudulent checks listed in Exhibit A to Taylor by reviewing bank surveillance photographs in which Taylor was identified while passing fraudulent checks.  (Hr'g Tr. 10.)  In addition, Commerce Bank ran a spreadsheet of additional frauds involving check makers[7] associated with Taylor.  (*Id*.)  Included in Exhibit A are those check frauds that occurred during the same time-frame that Taylor had been photographed passing checks of the same maker.  (*Id*.)

We are satisfied that the Government has established by a preponderance that the $98,595 loss figure set forth in Exhibit A is attributable to the conspiracy.

      2.     *Exhibit B*

The $98,970 figure listed on Exhibit B represents losses associated with Lisa Smith. Smith testified at trial about her check-cashing activities for the group.  (Trial Tr. 8/28/07 at 41.) Exhibit B was created by collating information provided by PNC Bank, Wachovia Bank, M&T Bank, and Commerce Bank.  (Hr'g Tr. 11-12.)  For all but seven of the transactions listed, there is video surveillance actually showing Smith passing the fraudulent checks.  (Hr'g Tr. 12.) Where there was no video, the fraudulent transactions are attributed to Smith by comparing the time-frame and victim account.  (*Id*.)  For example, there is video surveillance showing Smith posing as Sheila Freebury three times during a two-day period.  A fourth fraud on the Sheila Freebury account had no accompanying video, but occurred within hours of the frauds committed by Smith on video. (*Id*.)  Moreover, during this last fraud, the bank confiscated a false photo identification bearing the picture of Smith.  (*Id*. at 13.)

---

[7] "[T]he check maker is simply the person whose check it originally was, so that would be the person whose name is in the upper left-hand corner of the check."  (Hr'g Tr. 10.)

We are satisfied that the Government has established by a preponderance that the $98,970 loss figure listed in Exhibit B is attributable to the conspiracy.

>    3.    *Exhibit C*

The $29,531 figure listed on Exhibit C represents losses associated with Rachel Lukovsky.  Lukovsky testified in detail concerning her participation in this identity theft organization.  (Trial Tr. 8/27/07 at 119.)

For almost every fraud listed in Exhibit C there is a picture of Lukovsky, or her car, at the bank at approximately the time that a fraud occurred.  (Hr'g Tr. 13.)  In the one instance for which there is no photograph of Lukovsky passing the check, as with Lisa Smith, the fraud is connected to Lukovsky by considering the time-frame and victim account.  (*Id.*)  The incident for which there is no picture occurred on November 13, 2004, at 2:01 p.m.  (*Id.*)  The Government has a picture of Lukovsky passing a check on this same account only 37 minutes later.  (*Id.*)  Lukovsky also posed as the same payee at least two other times that day.  (*Id.*)

We are satisfied that the Government has established by a preponderance that the $29,531 loss figure listed in Exhibit C is attributable to the conspiracy.[8]

>    4.    *Exhibit D*

The $42,687 figure listed Exhibit D represents losses associated with Terry Hughes.

---

[8] In a letter to the Court, Allen Smith points out discrepancies regarding the dollar figure related to Lukovsky.  (Letter from Peter A. Levin, Esq., on behalf of Allen Smith, to the Court (June 19, 2008)).  He notes, without additional comment, that the Government has proposed four different loss amounts associated with Lukovsky: $118,875, $93,600, $40,000, and $29,531. (*Id.*)  The Government responds that the loss figure provided by Inspector Freeland, $29,531, is based upon checks linked to Lukovsky through bank records.  (Doc. No. 299 at 9.)  Some of the earlier numbers, by contrast, were "based on the estimates of loss provided by Lukovsky through her trial testimony."  (*Id.*)

Hughes also testified at trial about his fraudulent check-cashing activities for the conspiracy. (Trial Tr. 8/28/07 at 239.)  Hughes testified that he fraudulently withdrew approximately $50,000 from the bank accounts of other people during his tenure with the group.  (*Id*. at 277-78.)

The Commerce Bank losses listed in Exhibit D are connected to Hughes by the same method used with Taylor, Smith, and Lukovsky.  (Hr'g Tr. 13-14.)  As Exhibit D shows, each fraudulent transaction listed is supported by a corresponding photograph of Hughes at the bank. Hughes was also involved in bank fraud at Wachovia Bank, however, those losses are not included in Exhibit D.  (*Id*.)  Rather, the Wachovia Bank losses are listed in Exhibit K.  (Hr'g Tr. 31-32; Ex. K.)  The Commerce Bank losses ($16,465) and Wachovia Bank losses ($26,222) associated with Hughes total $42,687.  (Hr'g Tr. 32-33.)

We are satisfied that the Government has established by a preponderance that the $42,687 figure listed in Exhibit D is attributable to the conspiracy.

### 5.    *Exhibit E*

The $2,065 figure listed on Exhibit E represents losses associated with Celia Goldberg. Goldberg is an unindicted co-conspirator whose activities cashing fraudulent checks for the conspiracy were testified to by cooperating co-conspirators Terry Hughes, (Trial Tr. 8/29/07 at 84-87), Kelly Taylor, (Trial Tr. 8/30/08 at 47-48, 50), and Kevin Norris, (Trial Tr. 8/30/08 at 221, 223).

Exhibit E lists four fraudulent check transactions:  two with Shannon M. Teti as payee; one with Dana Lidell as payee; and one with Lori Arnold as payee.  Goldberg was arrested attempting to pass one of the Shannon M. Teti checks.  (Hr'g Tr. 14.)  A Dina Lidell check was

found in her car when she was arrested.  (*Id*.)  There was video surveillance for two of the

fraudulent transactions.  (*Id*.)  Goldberg admitted to Inspector Freeland that she had attempted to

pass all four of the listed checks.  (*Id*.)

We are satisfied that the Government has established by a preponderance that the $2,065

figure listed in Exhibit E is attributable to the conspiracy.

        *6.    Exhibit F*

The $29,300 figure listed on Exhibit F represents losses associated with Rebecca

Edwards.  Exhibit F lists frauds upon Citizens Bank committed by Edwards.  (Hr'g Tr. 15.)

During the undercover operation, when Kelly Taylor introduced Postal Inspector Yvette Thomas

to Charles White as a runner, (*see* Trial Tr. 8/30/07 at 250-73), Taylor provided White and

Norman with a checkbook of closed-account checks belonging to her, (*see* Trial Tr. 8/29/07 at

239-40).  (Hr'g Tr. 15.)  Only five of the checks from that checkbook were used by Taylor and

Inspector Thomas on the day of the undercover operation.  (*Id*.)  During the course of their

investigation of fraudulent check-cashing activities, the Postal Inspectors discovered that

Rebecca Edwards had cashed additional checks from the checkbook that Taylor had provided to

White.  (*Id*. at 16.)  Rebecca Edwards's picture was taken while passing the Kelly Taylor checks

and she was arrested.  (*Id*.)  The total loss from the Kelly Taylor checks passed, or attempted to

be passed, by Rebecca Edwards is $18,300.

Defendants argue that there was no evidence offered at trial regarding Edwards and that

attributing her activities to the conspiracy is sheer speculation.  (Doc. No. 296 at 2-3.)  They

argue that Kelly Taylor gave her own closed-account checks to others and that the checks

themselves were cashed in July of 2005, "well after she [Kelly Taylor] had stopped serving as a

check cashier for defendant White."  (*Id*. at 3.)

The record demonstrates that Taylor gave her closed-account checks to White and Norman on the day of the undercover operation to be used in furtherance of the conspiracy. Only five checks from her closed-account checkbook were used that day.  White and Norman were left in possession of the checkbook.  Edwards was arrested passing checks from that checkbook.  We agree with the Government that "[g]iven that Edwards used closed-account checks that were given to White and Norman by the primary check runner in the defendants' scheme, it is reasonable to conclude that there is a greater than 50 percent chance that Edwards obtained those checks from White or Norman in her capacity as a check runner in the defendants' scheme." (Doc. No. 299 at 10.)  Accordingly, we find that the Government has established by a preponderance that the $18,300 loss sustained as a result of the Kelly Taylor checks passed by Rebecca Edwards is attributable to the conspiracy.

In addition, Exhibit F lists a total of $11,000 in loss, resulting from the cashing of non-Kelly Taylor checks, which the Government attributes to Edwards.  Although it is reasonable to conclude that Edwards functioned as a runner for the White conspiracy with regard to the cashing of the Kelly Taylor checks, we conclude that the Government has not established that Edwards's fraudulent transactions involving the non-Kelly Taylor checks are attributable to the conspiracy.

7.      *Exhibit G*

The $85,130 figure listed on Exhibit G represents losses to Commerce Bank associated with frauds committed shortly after phone calls were made to Commerce Bank's interactive voice response ("IVR") system.  (Hr'g Tr. 17.)  Exhibit G lists Commerce Bank customers who

were defrauded and the phone numbers that called the IVR system.  (*Id*. at 17-18.)  Prior to each

account being compromised, a call was placed from the listed phone numbers inquiring into that

account.  (*Id*. at 18.)  The following cell phone numbers on Exhibit G are associated with the

following Defendants in this case: (a) the phone numbers associated with Charles White ended in

6186, 8055, and 8321; (b) the number associated with Allen Smith ended in 8582; (c) the phone

number associated Michael Merin ended in 2226; and (d) the phone number associated with

Antoine Norman ended in 4873.  (*Id*.)  None of the Defendants had bank accounts at Commerce

Bank.  (*See* Trial Tr. 8/27/07 at 93-94).

> Defendants argue against the inclusion of the IVR losses as follows:
>
> There was testimony from Inspector Freeland that some of the phone numbers
> therein listed belong to one or two of the charged members of the conspiracy.  The
> testimony was general and hardly specific.  It is no more than speculation that the
> several calls listed on this exhibit made by a member of the conspiracy (the name
> Michael Merin was mentioned once or twice) represents a conspiratorial transaction.
> In addition, from what I can tell, less then ten-percent of the phone numbers on this
> exhibit belonged to any member of the conspiracy.

(Doc. No. 296 at unnumbered 3-4.)

All of the phone numbers listed in Exhibit G are associated with members of the

conspiracy.  According to Exhibit G: four calls were made from White's three phones; sixteen

calls were made from Smith's phone; one call was made from Merin's phone; and seven calls

were made from Norman's phone.  In addition, Kelly Taylor testified with regard to the

Defendants' practice of calling into a victim's account prior to a bank run in order to get

personal information for use during the fraudulent check-cashing transaction.  (*See* Trial Tr.

8/29/07 at 218-19.)  Moreover, while Inspector Thomas was under cover, she watched Norman

make such a call and fill out a "cheat sheet" with personal account information just before going

out on a run.  (Trial Tr. 8/30/07 at 258-59.)  For each of the fraudulent transactions listed in

Exhibit G, there is a close correlation between the date and time of the inquiry into the account,

and the date of the fraud.  The losses detailed in Exhibit G reflect, and are completely consistent

with, the pattern established by the White conspiracy members of calling into a victim's account

shortly before attempting to defraud that account.

      Accordingly, we find that the Government has established by a preponderance of the

evidence that the IVR losses of $85,130 are attributable to the conspiracy.

      8.    *Exhibit H*

      The $9,828 figure listed in Exhibit H represents losses associated with Mike Decero.

Decero engaged in fraudulent check-passing excursions with Defendant Michael Merin.  (Hr'g

Tr. 20; Ex. H.)  Merin would pick Decero up and drive him to locations to cash checks.  (Ex. H.)

Decero also observed Merin meeting with other people and receiving a check and identification

from them prior to a run.  (*Id*.)  Decero provided police with Merin's license plate number and

telephone number.  (Ex. H1.)  The Exhibit H figure represents losses from two checks: (1) a

$4860 check that Decero cashed successfully; and (2) a check for $4968 that Decero attempted

to cash.  (Hr'g Tr. 22; Ex. H1.)

      At trial, the Government introduced into evidence a photograph showing Decero passing

a Dax Enterprises check.  (Hr'g Tr. 19-20.)  Evidence at trial showed that a phone call was made

from Merin's phone into the Commerce Bank IVR system shortly before the account was

compromised with the fraudulent DAX Enterprises check.[9]  (Hr'g Tr. 20; Trial Tr. 9/4/07 at 126-

27.)  An original application for a business account at Commerce Bank that had been filled out

---

[9] It appears that this loss is included in Exhibit G.

by Kendrick Ellison for Dax Investment Enterprises was seized during the search of Defendant

Akintunde Crawford's store, Rah's Fashion Boutique.  (Trial Tr. 9/4/07 at 72; Gov't Ex. 103.)

Ellison testified at trial that he had never been to Rah's Fashion Boutique, did not know

Crawford, and did not know of any reason why his application would be in the basement of

Crawford's store.  (Trial Tr. 9/4/07 at 120.)

Merin challenges the inclusion of the Decero losses on the grounds that Decero never

testified at trial, has now passed away, and that Exhibit H is merely a memorandum of an

interview.  (Hr'g Tr. 19-21.)  White argues that the Court should disallow the Decero losses

because his name never came up during trial and because Inspector Freeland did not link the

Decero losses to Charles White.  (Doc. No. 296 at unnumbered 4.)

The fact that Decero did not testify at trial does not preclude us from considering this

evidence.  As stated above, hearsay is admissible for sentencing purposes.  Furthermore, as

described above, although Decero's name was not raised at trial, evidence was introduced

regarding the fraudulent Dax Enterprises check that he passed.  That check, in turn, was

connected both to Merin, who phoned into the account shortly before the fraud, and Crawford,

whose basement held a fraudulent Dax Enterprises application.  Moreover, Decero worked

closely with Michael Merin, who is an established member of the conspiracy.

We are satisfied that the Government has established by a preponderance that the Decero

losses of $9,828 are attributable to the conspiracy.

9.    *Exhibit I*

The $1,500 figure listed in Exhibit I represents losses associated with Miguel Cubilete-

Arroyo.  Cubilete-Arroyo was arrested for attempting to pass a $1,500 check.  (Hr'g Tr. 23.)

14

Police confiscated a cell phone from Cubilete-Arroyo that was registered to Defendant Allen Smith.  (*Id.*)  The police had also conducted an inventory search of the car that Cubilete-Arroyo was driving.  (*Id.* at 24.)  The car was rented to a James Johnson.  (*Id.*)  The rental agreement listed Allen Smith's phone numbers listed as contact numbers.  (*Id.*)

We will not include this $1500 loss in the total loss figure based upon the facts presented.

10.    *Exhibit J*

The $295,579 figure listed on Exhibit J represents additional losses associated with the makers of checks which were fraudulently passed by runners Kelly Taylor, Lisa Smith, Rachel Lukovsky, Terry Hughes, and Celia Goldberg.  (Hr'g Tr. 24.)  Commerce Bank created a list of all of the makers of checks associated with runners Taylor, Smith, Lukovsky, and Hughes, as well as a list of every check with the same maker.  (*Id.* at 24-25.)  An example of the connection between the checks and the White conspiracy is demonstrated by four fraudulent checks passed on the account of Roy M. Sharpe and Vivian M. Sharpe.  (*Id.* at 25; Ex. J.)  Exhibit A shows that Kelly Taylor passed two Sharpe checks on April 6, 2004.  (Hr'g Tr. 25; Ex. A.)  The two additional Sharpe checks were passed on April 5th and April 6th.  (*Id.*)  A random cross-check of the dates that the maker checks on Exhibit J were passed with the dates that the runners tried to pass similar checks demonstrates a significant match.  (Hr'g Tr. 26.)

We have reviewed the date of fraud for each of the makers' checks listed on Exhibit J and compared those dates to the dates of fraud on the same makers' checks in Exhibits A through E. The results are compelling.  Our review convinces us that most of the frauds listed on Exhibit J are connected to the White conspiracy.  Most of the Exhibit J checks were passed within days, and at most two weeks, of similar maker checks passed by the runners associated with this bank

fraud ring.[10]  For example, the Exhibit J Mode Moderne, Inc. checks were passed on June 9,

2004.  (Ex. J.)  The checks ranged in value from $900 to $980.  (*Id.*)    According to Exhibit A,

Kelly Taylor passed three Mode Moderne, Inc. checks on June 13, 2004.  (Ex. A.)  These three

checks were for $960, $980, and $990.[11]  (*Id.*)

 Moreover, from the testimony of runners, as well as the admission of Charles White

himself, we know that this bank fraud conspiracy was very active.  It is perfectly consistent with

White's admission and with the testimony of the runners that additional maker checks were

passed by the runners.

 We will, however, exclude checks where the time period between the fraud date of the

Exhibit J check and the fraud dates listed in Exhibits A through E is significant and where we

could not find the same maker in Exhibits A through E.  The total value of these excluded checks

is $36,357.[12]

_____

 [10] The exception to this rule is for Kelly Taylor maker checks, listed on page 4 of Exhibit
J, which were passed from November 17, 2004 until January 2, 2005.  Terry Hughes passed a
Kelly Taylor check on November 21, 2004.  (Ex. D.)  Even though the Kelly Taylor maker
checks were passed outside of the two-week window that we have applied to the other Exhibit J
checks, we find that the very fact that the checks were Kelly Taylor's and that Terry Hughes
passed one of these checks early on supports attribution of these checks to the conspiracy.

 [11] In its supplemental memoranda, the Government addresses the Mode Moderne, Inc.
checks and points out the connection to Kelly Taylor.  (Doc. No. 299 at 10 n.3.)  Counsel for
White responds that "we don't know how many hundreds or even thousands of close-end checks
of this company were sold to individuals and groups (including the Charles White conspirators)
having nothing to do with the White conspirators, and who transacted these checks independent
of the White organization."  (Doc. No. 301 at unnumbered 2.)  Defense counsel ignores the close
proximity in time, between the passing of the Exhibit J checks and the passing of the same maker
checks by known White conspiracy runners, as well as the similarity in the amounts of the
checks passed.

 [12] We excluded certain checks related to makers Lamont Johnson (Case IDs
2004007035, 2004007372), Takiya Mention (Case ID 2004007284), Raheine O. Collins (Case
IDs 2004009861, 2005007356), Harsha Emmanuel Samuel (Case IDs 2004003739, 2004003725,

Accordingly, we find that the Government has satisfied its burden to prove by a preponderance that additional maker losses of $259,222 ($295,579 less $36,357) should be attributed to the conspiracy.

       11.    *Exhibit K*

The $398,824 figure listed on Exhibit K represents additional Wachovia losses from bank fraud and identity theft. Exhibit K lists a number of different suspects and checks cashed by those suspects. Inspector Freeland has become familiar with these suspects during the course of his investigation. Exhibit K contains highlighted and non-highlighted checks that were cashed by these suspects. The highlighted figures represent losses that are clearly connected to the White conspiracy. (Hr'g Tr. 27, 46.) The non-highlighted figures were not as clearly connected. (*Id*. at 46.) With regard to Suspect # 1 Richard Lawrence, Lawrence was arrested by Inspector Freeland. (*Id*. at 27; Ex. K.) Lawrence told Inspector Freeland that he got the vast majority of his fraudulent checks from Defendant Akintunde Crawford. (Hr'g Tr. 27.) Suspect # 3 Ronald Long passed Classic Settlements counterfeit checks. (Ex. K.) Inspector Freeland seized a copy of an original Classic Settlements check during the search of Rah's Fashion Boutique. (Hr'g Tr. 26-27, 27-28.) Unknown Suspect # 4 passed Nutter, McClennen & Fish checks. (Ex. K.) Counterfeit Nutter, McClennen & Fish checks were seized during the search of Rah's Boutique. (Hr'g Tr. 29.) Unknown Suspect # 4 also passed Marc A. Blackwell, Frank C. White, and Yamille Powell checks, which are maker checks which Terry Hughes passed for the conspiracy.

_____

2005000567), Dewitt Fred Simon (Case IDs 2004007248, 2004007392), Ava Hunter (Case IDs 2005000487, 2005000815, 2005000516, 2005000708), Amy A. Snyder (Case IDs 2005002212, 2005002297, 2005002417, 2005002520), Melanie J. Milke (Case IDs 2005004589, 2005004761), and Jerome Smith (Case ID 2006009295).

(Hr'g Tr. 29; Ex. K.)  Terry Hughes also passed a Yamille Powell check.  (Hr'g Tr. 30.)  The next sequential Yamille Powell check was found in Rah's Fashion Boutique.  (*Id.*)  Suspect # 5 Herbert James Johnson, Unknown Suspect # 6, and Unknown Suspect # 9 all passed Nutter, McClennen & Fish checks.  (Hr'g Tr. 29, 30, 31; Ex. K.)  Unknown Suspect # 8 passed Marc A. Blackwell checks.  (Hr'g Tr. 31; Ex. K.)  Terry Hughes also passed Blackwell checks for the conspiracy.  (Hr'g Tr. 29.)  Unknown Suspect # 11 passed Classic Settlements, Inc. checks, like the Classic Settlement, Inc. checks found in Rah's Boutique.  (Hr'g Tr. 32; Ex. K.)  Unknown Suspect # 12 passed Yamille K. Powell and Frank C. White checks, like those passed by Hughes for the conspiracy.  (Hr'g Tr. 32; Ex. K.)[13]  Suspect # 14 and the final Unknown Suspect both passed checks of the maker Title Associates of VA, which is a maker whose checks were passed by Terry Hughes for the conspiracy.  (Ex. K.)

White, Smith, and Norman do not challenge the inclusion of the highlighted figures in Exhibit K, which total $145,337.  (Doc. No. 296 at 5.)  They argue, however, that we should disallow the non-highlighted figures.  (*Id.*)  The Government argues that "[t]hose transactions that are not highlighted are linked to the defendants' scheme by the fact that the checks used in those transactions share the same maker as checks shown to have been used in the defendants' scheme."  (Doc. No. 299 at 10.)

We are satisfied that the evidence supports a finding by a preponderance of the evidence that the losses associated with the highlighted checks should be attributed to the conspiracy. Each of the highlighted checks is linked directly either to known runners for the conspiracy or to

---

[13] The losses associated with Terry Hughes (Suspect # 13) are not highlighted because they are included on the main spreadsheet along with the Hughes frauds at Commerce Bank. (Hr'g Tr. 32-33.)

counterfeit checks found in Rah's Fashion Boutique.  Accordingly, we will include the total of the highlighted checks, $145,337, in our total loss calculation.  We will not include the checks listed in the non-highlighted portions of Exhibit K in the total loss amount.

<em>12.    Total Amount of Loss</em>

The total loss amount that the Government has established by a preponderance of the evidence from Exhibits A through K is $789,665.  This falls within the range of $400,000 to $1,000,000 set forth in Section 2B1.1(b)(1) of the Guidelines, with a corresponding increase of 14 levels.  We recognize that it is not necessary to find a precise number.  We also recognize that the amount of loss caused by the White conspiracy may be higher than the $789,665 figure that we have identified.  We are satisfied, however, that this figure reflects a reasonable estimate of the amount of loss attributable to the conspiracy based upon the information available in the record.

**B.    Accomplice Attribution**

Having determined the total loss to be attributed to the conspiracy, we must now determine what part of that total loss should be attributed to each defendant.

Section 1B1.3(a)(B) of the Sentencing Guidelines provides that in the case of jointly undertaken criminal activity, specific offense characteristics shall be determined on the basis of "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity."  U.S.S.G. § 1B1.3(a)(B) (2007).  This guideline is facially similar to the law of criminal liability for conspiracy, under which a co-conspirator can be found guilty of substantive offenses committed by co-conspirators if the jury finds that "a party to the conspiracy committed a crime both 'in furtherance of' *and* 'as a foreseeable consequence of' the

conspiracy . . . ." *United States v. Turcks*, 41 F.3d 893, 897 (3d Cir. 1994) (citing *Pinkerton v.*

*United States*, 328 U.S. 640, 646 (1946); *United States v. Gonzalez*, 918 F.2d 1129, 1135 (3d

Cir. 1990)).  However, the application notes to the Sentencing Guidelines instruct that "[t]he

principles and limits of sentencing accountability under this guideline are not always the same as

the principles and limits of criminal liability."  U.S.S.G. § 1B1.3 app. note 1.  The application

notes further direct that in determining the guideline range for defendants involved in jointly

undertaken criminal activity, "the focus is on the specific acts and omissions for which the

defendant is to be held accountable . . . rather than on whether the defendant is criminally liable

for an offense as a principal, accomplice, or conspirator."  *Id*.  *See also United States v. Collado*,

975 F.2d 985, 991 (3d Cir. 1992) ("The language of this note indicates that, rather than

evaluating accomplice attribution in light of the scope of the conspiracy as described in the count

of conviction and the defendant's awareness of the possibility that co-conspirators would

distribute amounts in addition to those amounts distributed by the defendant, courts should look

to the defendant's role in the conspiracy."); *id*. at 997 (finding that "the relevant conduct

provision is not coextensive with conspiracy law . . .").

The Third Circuit has held that in analyzing accomplice attribution in conspiracy cases,

"the crucial factor is . . . the extent of the defendant's involvement in the conspiracy."  *Collado*,

975 F.2d at 992.  Moreover, the Third Circuit has directed that "a searching and individualized

inquiry into the circumstances surrounding each defendant's involvement in the conspiracy is

critical to ensure that the defendant's sentence accurately reflects his or her role."  *Id*. at 995.  In

*United States v. Duliga*, 204 F.3d 97 (3d Cir. 2000), the Third Circuit held that in order to

attribute to one co-conspirator loss resulting from the acts of other co-conspirators, the loss must

20

have been: "(1) in furtherance of the jointly undertaken activity; (2) within the scope of the

defendant's agreement; and (3) reasonably foreseeable in connection with the criminal activity

the defendant agreed to undertake." *Id*. at 100 (citing, *inter alia*, *United States v. Evans*, 155

F.3d 245, 254 (3d Cir. 1998)).

  In *Duliga*, the district court attributed to a defendant convicted of participating in a

telemarketing conspiracy the entire amount of loss caused by the conspiracy, approximately

$1,200,000.  204 F.3d at 100.  The defendant appealed, arguing that his offense level should only

have been determined on the basis of losses that he caused personally, approximately $155,000.

*Id*.  The Third Circuit reviewed the defendant's role in the conspiracy and determined that even

though the defendant was aware that the telemarketing scam was not legitimate, he became one

of the company's top telemarketers, trained newly recruited telemarketers, and assisted in

relocating the business.  *Id*. at 99.  The court concluded that the defendant was a "key player in

the telemarketing scam from its inception to its conclusion and that the losses generated by that

scam were reasonably foreseeable in connection with the scope of the criminal activity [the

defendant] agreed to jointly undertake."  *Id*. at 101.  The court affirmed the district court's

attribution of the entire loss to the defendant.  *Id*.

  Similarly, in *United States v. Hall*, 996 F.2d 284 (11th Cir. 1993), the Eleventh Circuit

affirmed a district court's attribution to the defendant of fraud losses caused by others.  *Id*. at

287.  In *Hall*, the defendant and several others were separately indicted on charges of wire fraud

for their participation in a fraudulent scheme in which they would inform victims that they won a

large cash prize, but that the victim would have to wire money via Western Union in order to pay

taxes on the prize.  *Id*. at 285.  "The various participants in this scheme, although acting on their

own behalf, aided and abetted one another by sharing lead sheets of potential victims and sharing telephones.  Each of the participants knew each other and each was aware of the activities of the others."  *Id*. at 285-86.  The Eleventh Circuit found that "the plain language of section 1B1.3(a) clearly indicates that the [defendant] was correctly held accountable for the amount of loss attributable to the other participants involved in the common scheme."  *Id*. at 286.

After a searching and individualized inquiry into the circumstances surrounding the involvement of Defendants White, Norman, Smith, Merin, and Crawford in this conspiracy, we are satisfied that the same result obtains here, and each Defendant should be held accountable for the total amount of loss resulting from the conspiracy.

### 1.   Charles White

As the ringleader of this bank fraud and identity theft scheme, Charles White managed his co-conspirators, recruited runners, accompanied runners during check-cashing runs, procured false identifications and fake checks, and generally organized the various components of the scheme.  White was in constant contact with his co-conspirators by telephone and was fully aware of the activities of his subordinates.  On the day that Postal Inspector Yvette Thomas infiltrated the conspiracy, White told Inspector Thomas that he had made over $2,000,000 from this identity theft ring.  (Trial Tr. 8/30/07 at 273.)

Indeed, White appears to concede that the total reasonably foreseeable loss should be attributed to him.  (Doc. No. 296 at unnumbered 2.)  White has urged the Court to attribute to him a loss calculation of more than $400,000, but less than $1,000,000.  (Doc. No. 301 at unnumbered 3; Doc. No. 296 at unnumbered 5.)  We will attribute the total amount of the loss to White.

### 2.      Antoine Norman

Similarly, Antoine Norman's role in the conspiracy was so substantial that there is no question but that the entire amount of loss should be attributed to him.  As White's right-hand man, Norman assisted White in coordinating and recruiting runners, accompanying runners on runs, and counting the money after a run.  Norman communicated with other members of the conspiracy regularly, and also accessed automatic bank records to create "cheat sheets" for runners to use when cashing checks.

Like White, Norman has offered no argument that an amount less than the total loss should be attributed to him.  Norman agrees that a loss calculation of more than $400,000, but less than $1,000,000 is appropriate.  (Letters from Marc I. Rickles, Esq., on behalf of Antoine Norman, to the Court (June 17, 2008, June 30, 2008)).  We will attribute the total amount of loss to Norman.

### 3.      Allen Smith

The evidence at trial demonstrated that Allen Smith's primary role in this conspiracy was to provide personal and account information about bank customers to his co-conspirators.  For example, Smith provided copies of original checks to runners to use on bank runs.  Runner Kelly Taylor testified that Charles White received copies of original checks from Allen Smith.  (Trial Tr. 8/29/08 at 207.)  In addition, Runner Rachel Lukovsky testified that Allen Smith maintained a black leather notebook in which he kept blank checks and a list of names and addresses.  (Trial Tr. 8/27/08 at 134.)  Lukovsky testified that she had observed Smith filling out and signing the blank checks that he kept in the notebook.  (*Id*. at 135-36.)  Smith would then give Lukovsky the completed check, and she would attempt to cash it at a bank.  (*Id*. at 136.)

In addition to providing information, however, Smith also played a more active role in the conspiracy.  Kelly Taylor testified that Allen Smith accompanied her on runs and that Charles White told her that Smith wanted to play a larger role in the bank fraud conspiracy. (Trial Tr. 8/29/08 at 208.)  Taylor testified that Smith wanted to acquire a larger share of the scheme's profits and therefore began to accompany runners in place of Antoine Norman.  (*Id*.) Consistent with this testimony, Rachel Lukovsky identified Allen Smith at trial and testified that he would sometimes accompany her when she cashed checks at banks.  (Trial Tr. 8/27/08 at 133.)

Smith's name is also connected to at least two cars used by runners.  Rachel Lukovsky testified that another runner, Hector Ortiz, would often pick her up in a Grand Am, which they used to make runs to banks.  (Trial Tr. 8/27/08 at 136.)  Lukovsky testified that one day she looked in the glove compartment and noticed that the name listed on the insurance and registration was Allen Smith.  (*Id*. at 136-37.)

Finally, Inspector Freeland was able to associate two phone numbers with Allen Smith. (Trial Tr. 9/4/07 at 85.)  Smith called Commerce Bank's automated phone system 602 times between February, 2004, and November, 2005.  (*Id*. at 95-96.)  Smith did not have an open account at Commerce Bank when he made the calls.  (Trial Tr. 8/27/08 at 94.)  Moreover, Smith made a number of calls to various members of the conspiracy:  (a) 99 phone calls to Antoine Norman between February 14, 2005, and August 31, 2005, (Trial Tr. 9/4/07 at 94-95); (b) 247 phone calls to Charles White's phone numbers, (*id*. at 97); (c) six phone calls to Michael Merin, (*id*. at 96-97); (d) 47 phone calls to Akintunde Crawford, (*id*. at 97); (e) 34 phone calls to Lisa Smith's home phone between March 30, 2005, and April 14, 2005, (*id*. at 96); and (f) 144 phone

calls to Rachel Lukovsky, (*id*.).

Allen Smith's role in this conspiracy was clearly substantial.  Although Smith's primary role was to provide customer information, his participation in the conspiracy was considerably more wide-ranging, from maintaining personal account information on victims to accompanying runners as they defrauded banks to assisting in procuring cars to be used by runners.  It is reasonable to conclude based upon the evidence that Smith was aware of the scope and purpose of this conspiracy, and that he was aware of precisely how his activities furthered the illegal goals of the conspiracy.  Indeed, with full recognition of the conspiracy's objectives, Smith expressed to Charles White his desire to become more involved in the bank fraud and identity theft ring in order to reap greater profits.  We are satisfied that the co-conspirator losses were in furtherance of the jointly undertaken activity to defraud banks, that the losses were within the scope of Smith's agreement to participate in all aspects of this conspiracy, and that the losses were reasonably foreseeable in connection with this agreed-upon criminal activity.

Like White and Norman, Smith requests that the Court attribute to him an amount of loss of more than $400,000 but less than $1,000,000.  (Letter from Peter A. Levin, Esq., on behalf of Allen Smith, to the Court (June 19, 2008)).  We will attribute the total amount of loss to Smith.

        4.    *Michael Merin*

Michael Main's primary role in the conspiracy was to provide personal information to his co-conspirators for use in defrauding bank accounts.  Merin worked at Select Financial, a debt collection agency.  He passed on personal information from customers to Charles White.  Merin had access to the personal information of Select Financial's customers.  (Trial Tr. 8/28/07 at 190.)  Many of those customers later had their accounts compromised by defendants.  Merin also

25

stole checks from Select Financial and passed them on to the conspiracy.  (Trial Tr. 8/28/07 at 187-88.)  Copies of some of these checks were found during the search of Rah's Fashion Boutique.  (*Id*. at 186-87; Gov't Ex. 98.)

Runner Kelly Taylor identified Merin as a co-conspirator.  (Trial Tr. 8/29/07 at 211.) She observed White calling "Mike" and giving him information from checks, such as name and address, in order to get more information, such as a birth date and social security number.  (*Id*.) White would then write this additional information down next to the check.  (*Id*. at 212.)  Taylor spoke with "Mike" on the phone twice after information that he provided was rejected by bank tellers.  (*Id*. at 213.)  When the social security number and birth date that she had on a cheat sheet did not match the account that she was trying to fraudulently access, Taylor called White, who in turn called "Mike."  (*Id*. at 214.)  Taylor met Merin twice.  (*Id*. at 215.)  She is sure that Merin was "Mike" because Charles White introduced them and told her that this was the "Mike" that she had spoken with on the phone.  (*Id*. at 215.)  On the day of one of their meetings, Merin was supposed to accompany Taylor and Charles White on a bank run, but he was late and they went without him.  (*Id*. at 217.)  White told Taylor that Merin could come another time.  (*Id*.)

Inspector Freeland identified two phone numbers associated with Michael Merin.  (Trial Tr. 9/4/07 at 84.)  There were: (a) 314 phone calls between Charles White and Michael Merin between August 19, 2004 and October 25, 2005, (*id*. at 90-91); (b) 91 phone calls from Antoine Norman to Merin between February 11, 2005 and September 20, 2005, (*id*. at 94); (c) 87 phone calls from Merin to Norman between March, 2005 and September, 2005, (*id*. at 98); (d) six phone calls from Allen Smith to Merin, (*id*. at 96-97); and (e) 128 calls between Merin and Akintunde Crawford between January 27, 2005 and November 12, 2005, (*id*. at 97).

Inspector Freeland's phone record analysis also confirmed contact between Merin and the defrauded banks. Merin called Wachovia Bank five times between September 8, 2005, and October 16, 2005. (*Id*. at 98.) He also called Commerce Bank 19 times between January 4, 2005, and November 9, 2005. (*Id*.) Merin, like his co-defendants, did not have a bank account at any of the banks that he called. One of Merin's calls was made to Commerce Bank's IVR system on July 1, 2005 to access the Dax Enterprises account. (*Id*. at 126.) As mentioned above in our discussion related to Exhibit H and Michael Decero's relationship with Merin, an application to open a business account for Dax Enterprises was found in the basement of Rah's Fashion Boutique. (Trial Tr. 9/4/07 at 72; Gov't Ex. 103.) Merin accessed the IVR system before Decero passed the fraudulent Dax check. Furthermore, Decero described to Inspector Freeland extensive fraudulent check-cashing activities between himself and Merin. (*See* Ex. H, H1.)

Merin argues that his role in this conspiracy was limited to providing Charles White with approximately 20 to 24 social security numbers from customer accounts at Select Financial, for which he received $100 each. (Doc. No. 300 ¶ 1.) Merin states that "[t]he sale of the names was the only involvement Merin had in the illegal activity." (*Id*.) He asserts that "[t]here was no evidence presented at trial that Merin was aware of any of the other Defendants or any of the other transactions at any of the other banks." (*Id*. ¶ 4.) Merin concludes that the sale of these 20 names resulted in total losses of less than $50,000. (*Id*. ¶ 3.) Merin argues that because the Government has not proven that he was involved in any other transactions, the Government has failed to show that the other losses were within the scope of Merin's agreement or reasonably foreseeable by him in connection with the criminal activity that he agreed to undertake. (*Id*. ¶¶

27

7, 8 (citing, *inter alia*, *Evans*, 155 F.3d at 254).)

Merin's argument that he played a limited role in this conspiracy is belied by evidence showing far-reaching participation.  Indeed, the claim that his role was limited to selling 20 social security numbers is ridiculous when considered in the context of the evidence introduced at trial and at the hearing on June 12th.  There were hundreds of calls between Merin and White, Norman, Smith, and Crawford.  Merin would have us believe that all of these hundreds of phone calls, to various members of the conspiracy, over a period of several months, were related to the sale of only 20 social security numbers.  However, the evidence and testimony showed that Merin himself called at least two of the victimized banks multiple times, that he planned on accompanying a runner on a check-cashing run, and that he assisted Michael Decero with fraudulent check-cashing.  Certainly, Merin was aware of the scope and purpose of this conspiracy.  Despite this knowledge, Merin chose to become involved in the conspiracy's illegal activities.  Merin's conduct contributed significantly to the success of this conspiracy.  We are satisfied that the losses caused by Merin's co-conspirators were entirely foreseeable and within the scope of the criminal activity that Merin agreed to undertake.  Accordingly, we will attribute the total amount of loss to Merin.

### 5.    *Akintunde Crawford*

Defendant Akintunde Crawford's primary role in this conspiracy was to make false identifications and counterfeit checks to be used by runners to access the accounts of bank customers.  Evidence at trial showed that a large cache of documents relating to bank fraud and identity theft, including fake drivers' licenses, counterfeit checks, passport photographs, and copies of bank documents, were found during the search of Crawford's store, Rah's Fashion

Boutique.  (*See, e.g.,* Trial Tr. 9/4/07 at 70-76; Gov't Exs. 195, 196.)  During the search,

Inspector Freeland seized computer disks which held check templates, scans of fake

identifications, scans of checks, and scans of individuals' photographs.  (Trial Tr. 9/4/07 at 71,

228.)  One of the computer disks held an image of a Delaware driver's license in the name

"David L. London."  (*Id*. at 76, 127; Gov't Ex. 197.)  The picture on the license was Akintunde

Crawford.  (*Id*.)  Among the original checks that Inspector Freeland found were checks written

to Select Financial, the business which employed Michael Merin.  (Trial Tr. 9/4/07 at 70-73.)

There were also checks found with the same makers as those passed by runner Terry

Hughes, (*see* Gov't Exs. 34, 100, 194), as well as a check from the account of David Ginfrida,

(*see* Gov't Ex. 105), with Ginfrida's personal information written on the check along with the

notation, "Pooch Man."  "Pooch" is Charles White's nickname.  As mentioned above, a Dax

Enterprises application was also found in the basement.  (Trial Tr. 9/4/07 at 72; Gov't Ex. 103.)

Michael Merin made a call into the Dax Enterprises account at Commerce Bank, and Michael

Decero passed a fraudulent check from that account.  Suspect # 1 Richard Lawrence told

Inspector Freeland that Crawford provided him with most of his "work," i.e., fraudulent checks.

(Hr'g Tr. 27.)

Next to a collection of Crawford's mail in the basement of Rah's Boutique, Inspector

Freeland found a manual for making identifications entitled "User's Guide, ID Maker, Lexington

Technology."  (Trial Tr. 9/4/07 at 70, 299; Gov't Ex. 101.)  Runner Terry Hughes identified

Crawford as "Raheem" and testified that he gave Charles White a passport photo of himself to be

made into a false identification.  (Trial Tr. 8/28/07 at 261.)  Crawford was present when White

subsequently gave the false identification to Hughes, who used the ID to cash fraudulent checks.

29

(*Id*. at 261, 263-64.)

In addition to false identifications and counterfeit checks, Crawford provided clothes from Rah's Fashion Boutique to runners preparing for "walk-in" bank frauds so that they would look respectable and not suspicious.  Charles White sent Terry Hughes to Rah's Fashion Boutique for this purpose.  (Trial Tr. 8/28/07 at 265-66.)  Photographs identified at trial, (Gov't Exs. 35, 37, 39, 41, 43), showed Hughes wearing the clothing from Rah's Fashion Boutique while standing in the various banks during the fraudulent check-cashing transactions.  (Trial Tr. 8/28/07 at 266-69.)

Crawford also played a role in preparing for check-cashing excursions and in counting money afterward.  Terry Hughes testified that both before and after cashing checks, Hughes and White would go to Crawford's store.  (Trial Tr. 8/28/07 at 272.)  White and Crawford would speak at the store, and on one occasion Hughes observed Crawford and White splitting up the money from a run.  (*Id*. at 272-73.)  Runner Kevin Norris testified that he drove with White to Rah's Fashion Boutique on several occasions, sometimes before making check-cashing runs.  (Trial Tr. 8/30/07 at 204, 207-08.)  On these occasions Norris observed White and Crawford speaking and sometimes arguing.  (*Id*. at 207-08.)  Charles White told Norris that he and Crawford argued about the money.  (*Id*. at 209-10.)

Crawford was not only involved in the "walk-in" bank frauds.  Postal Inspector Yvette Thomas testified that she told White that she would only participate in drive-through bank frauds.  (Trial Tr. 8/30/07 at 259-60.)  After meeting White, she and Kelly Taylor, and White and Norman, drove to Rah's Fashion Boutique.  (*Id*. at 256-57.)  Inspector Thomas watched as White got out of his car and went into Rah's Fashion Boutique.  (*Id*. at 258.)  Inspector Thomas then

observed White leave Rah's Fashion Boutique and return to his car.  (*Id.* at 259.)  Inspector

Thomas observed that White was now holding a Pennsylvania driver's license and another form

of identification for an African-American female as well as a photocopy of a check.  (*Id.*)  White

did not have these items before entering Crawford's store.  (*Id.* at 259-60.)  Inspector Thomas

and Kelly Taylor then went to several banks to conduct drive-through check-cashing frauds.

White was in constant contact that day with Crawford's store.  (Trial Tr. 9/4/07 at 118-19.)

Inspector Freeland identified four telephone numbers associated with Crawford.  (Trial

Tr. 9/4/07 at 79-80, 86.)  A review of the phone records reveals: (a) approximately 280 calls

between White and Crawford between January 2005 to November 2005, (*id.* at 92-93); (b) 128

calls between Crawford and Michael Merin, (*id.* at 97); (c) 47 calls to Crawford from Allen

Smith, (*id.*); and (d) five calls between Crawford and Antoine Norman, (*id.* at 94).  Many of the

calls between Crawford and his co-conspirators took place at or near the times that the identity

thefts with which Crawford was charged took place.

In his amount of loss memorandum, Crawford argues that he should have only $256,941

of the loss attributed to him.  (Doc. No. 302 at unnumbered 6.)  Arguing that his role in the

conspiracy was to create and provide false identifications, which were only needed during the

walk-in runs, Crawford asserts that no drive-through related losses should be attributed to him.

(*Id.* at unnumbered 2.)

Crawford's role in this conspiracy was not so limited.  Although Crawford did provide

false identifications and clothes to runners preparing for in-person bank fraud, the evidence

showed that he also played a far broader role in the scheme.  Crawford's store, Rah's Fashion

Boutique, contained templates for fake checks, which were used during drive-through runs.

Indeed, on the day that undercover Postal Inspector Thomas committed drive-through frauds for this conspiracy, White got the fraudulent documents from Rah's Boutique.  The evidence establishes that Crawford certainly knew the extent of this conspiracy, that he was well-aware of the various facets of this conspiracy, and that his assistance was calculated to further the main purpose of the conspiracy, bank fraud and identity theft.  One wonders how successful this identity theft conspiracy could have been without Crawford.  Clearly, Crawford's distribution of counterfeit and closed-account checks was not limited to the walk-in prong of this conspiracy. The Dax Enterprises fraud, which is linked to a document found in the basement of Rah's Fashion Boutique, occurred at Commerce Bank, which had only drive-through frauds.

We are compelled to conclude that the entire amount of loss is attributable to Crawford. These losses were within the scope of his criminal agreement and reasonably foreseeable in connection with the criminal activity that Crawford agreed to undertake.

## III.   CONCLUSION

For all of these reasons, we conclude that Defendants White, Norman, Smith, Merin, and Crawford have each earned a 14 level increase in their offense level based upon fraud loss of between $400,000 and $1,000,000.

BY THE COURT:

_____
R. Barclay Surrick, Judge

32